1  PAUL MERRITT
   P.O. Box 9145
2  Laguna Beach, CA. 92652
   Tel: (949) 249-2492
3  merrittmaster@yahoo.com



4

5  Attorney for Plaintiff
6  PAUL MERRITT, in Pro Per

7

8              UNITED STATES BANKRUPTCY COURT

9       IN THE CENTRAL DISTRICT OF CALIFORNIA - CENTRAL DIVISION

10  In re: LAKE MATHEWS MINERAL          ) CASE NO. 2:16-bk-16363-NB
    PROPERTIES, LTD,                     )
11                                       ) CHAPTER 7
                         Debtors         )
12                                       ) ADV. Pro. _____
                                         )
13  PAUL MERRITT, an individual,         ) VERIFIED ADVERSARY COMPLAINT FOR:
                                         )
14                       Plaintiffs      ) 1. DECLARATORY RELIEF TO QUIET TITLE
                                         ) 2. VIOLATION OF CALIFORNIA BUSINESS AND
15  PECAS, LLC, a Delaware Limited Liability )    PROFESSIONS CODE § 17200 FOR
    Company, CHABAD TEMPLE, INC        )        AN UNLAWFUL  BUSINESS PRACTICE
16                                       ) 3. ACTUAL FRAUDULENT TRANSFER
                         Defendants      )

17

18              **FEDERAL BANKRUPTCY COURT JURISDICTION**

19      1. Merritt consents to entry of final orders or judgment (FRBP  § 7008) with a reservation of

20  Merritt's pending appeals. This action is brought under FRBP  § 7001(1), to recover money and

21  property; FRBP  § 7001(6) to determine debt discharge; FRBP  § 7001(7) injunctive or equitable

22  relief, FRBP  § 7001 (9) for declaratory relief. From the BC's January 29, 2019 Order that it was

23  without prejudice to any equity interest Merritt may have in the Debtor, Merritt pleads with

24  particularity in FRCvP Rule 9 for his equity interest from Defendant's 11 USC § 727 et seq. Fraud.

                            **VENUE**

25      2. Venue is proper under 28 USC  § 1409(a) as the debtor filed for Chapter 11 relief in the

26  Central Division of the U.S. District Court for the Central District of CA, the Chapter 11 was

27  converted to Chapter 7, the events described herein took place in Los Angeles County CA,  and the

28  primary place of business of the debtor and Defendants was in Los Angeles County, CA.

1

## NATURE OF THE ACTION

3. This case involves Paul Merritt's ("Merritt") demand, pursuant to the badges of fraud under Cal. Civ. Cd. § 3439, et seq., and Bankruptcy Code § 548(a)(1), for restitution of Merritt's 18.9989% interest in PECAS, LLC, after PECAS induced Lake Mathews Mineral Properties, Ltd., a California Limited Partnership, ("LMMP") to transfer 100% of itself into, PECAS on or about January 20 and 23, 2013, giving back to LMMP a 25% interest in PECAS that PECAS itself purchased back in or about September 2017. Merritt's complaint is that PECAS, while promoting a fiction that it, PECAS, had acquired all of LMMP and Merritt's interest thereof, has never perfected its legal right, title and interest in Merritt's lawful 18.9989% interest pursuant to the July 14, 2015 Order of the Superior Court of California, County of Riverside, Case No. RIC 130938 and PECAS unlawfully misappropriated from him his 18.9989% interest in a conspired theft, embezzlement and conversion.

4. Merritt requests this case be transferred his to the Riverside Superior Court to enable Merritt, on behalf of himself, his creditors and investors, to seek a judgment that determines his claims to and clouds upon title to his 18.9989% interest

5. The historical facts are incident to a Written Stipulation and Settlement Agreement executed by the Metropolitan Water District ("MWD") on or about April 21, 1937, with multiple individuals, granting the water and mineral rights on 800 acres of land 300 feet below the surface of Lake Mathews in Riverside California, and approximately 62.9 acres surrounding Lake Mathews as a staging platform for mining operations for said water and mineral rights. These individuals then transferred their right, title and interest in said Stipulation into LMMP in or about 1980. In or about January 2007 Lawrence Holmes Senior Mining, Inc. ("LHSM") was formed and became the General Partner of LMMP. In or about January 12, 2007, an Amended and Restated Agreement of Limited Partnership was created for LMMP, stating among other things, in Article XVIV, the time in which LMMP shall be dissolved, its assets disposed of and its affairs wound when there was a sale of all or substantially of the assets of LMMP. James Holmes ("Holmes"), was the Director and President of LHSM and owned a 37.8818 interest in LMMP. On October 14, 2011, Holmes gave to Merritt, for consideration, one half (½) of all the right, title and interest Holmes had in LMMP, which was a 37.8818 interest in the 1937 MWD Stipulation.

6. In or about the end of 2012, Silverstrand. LLC, pursuant to a security interest from LMMP to Silverstrand to collateralize the loan to LMMP for approximately $350,000.00, foreclosed upon 62.9 acres, the staging rights to mine the water and mineral rights in the 1937 MWD Stipulation.  The foreclosure on LMMP's 62.9 acres was, in effect, a sale of all or substantially of the assets of LMMP, since with the loss of the staging ground for mining the water and mineral rights, LMMP lost all reasonable use of the remaining portion of the 1937 MWD Stipulation.

7. Pursuant to Article XVIV of LMMP's January 12, 2007 Amended and Restated Agreement, LMMP was required to grant back to the Limited Partners, all of their right, title and interest each of them had in LMMP. Rather than doing so, however, unbeknownst to Merritt at the time, on or about January 20 and 25, 2013, PECAS coerced LMMP entered into a secrete, unlawful arrangement with PECAS in which LMMP transferred all its interest in the 1937 MWD agreement to PECAS, including Merritt's 18.9989% interest. .

8. The unlawful arrangement was that in consideration for PECAS paying off a judgment against LMMP and James Holmes for $225,000.00, PECAS induced Holmes cause LMMP to transfer to PECAS, all of LMMP's right, title and interest it had in the 1937 MWD Stipulation, and LMMP would be giving a 25% Class D interest in PECAS, with no rights of control, no voting rights, no rights of inquiry and only had the right to wait for a monetized amount PECAS would receive.

9. PECAS then induced Holmes to induce all the other limited partners to ratify the sale. PECAS then expressly admitted in writing that if Holmes did previously give Merritt one half of the interest he, Holmes had in LMMP, that PECAS would never be able to obtain the legal, lawful authorization and requirements to perfect said transfer.

10. PECAS, induced Holmes and acted in complicity with Holmes to steal, convert, embezzle and misappropriate back from Merritt, the interest Holmes had previously given to Merritt to enable PECAS the fiction of a lawfully authorized transfer.

11. Paul Merritt filed suit against LMMP and Holmes in the Superior Court of California, County of Riverside on August 13, 2013, , Case No. RIC 1309386, for a return of his, Merritt's interest. On July 7, 2015, the RIC 1309386 Court entered an Order on Settlement and Merritt was given back an 18.9989% class D interest in LMMP with a minimum stated value of $250,000.00 and

1    the Court retained jurisdiction over any settlement disputes.

2        12. LMMP was then required to act in accordance with Article XVIV, to enable its limited

3    partners to receive back their interests in the 1937 MWD Stipulation, the mineral and water rights,

4    wind up its affairs. In November 2015, when LMMP moved the RIC 1309386 Court for an Order to

5    file a late Cross Complaint in RIC 1309386 for Rescission of the LMMP/PECAS arrangements,

6    PECAS, immediately filed a Declaratory Relief Action in Los Angeles Superior Court, to enforce the

7    PECAS/LMMP arrangements, Case No. BC 600724. In January 2016, LMMP Answered the PECAS

8    Declaratory Relief Complaint and LMMP filed its Cross Complaint for Rescission of the

9    PECAS/LMMP arrangements.

10       13. During discovery, that included admissions by PECAS of its collusion,  LMMP was

11   facing financial pressures, and multiple suits from its limited partners, including Merritt, for a return

12   of their interests to them in the 1937 MWD Stipulation.

13       14. LMMP's BK attorney advised LMMP it could conclude its BC 600724, rescission claim

14   in an Adversary Proceeding in Chapter 11.  On May 13, 2016, LMMP filed a Chapter 11 proceeding

15   listing PECAS (or entities in complicity with PECAS) as a joint debtor, but LMMP conspicuously,

16   and then inexorably failed to correct the many  deficiencies in the filing the Court demanded.

17       15. In September 2017, the Chapter 11 trustee erroneously determined that LMMP had no

18   value and sold the 25% interest LMMP had in PECAS back to PECAS for approximately

19   $75,000.00.

20       16. On or about January 29, 2019, the Bankruptcy Court entered an Order denying Merritt's

21   Opposition to the trustees motion that Merritt was not a secured creditor, Merritt;'s POC was

22   disallowed to the extent it asserted any secured or unsecured claim against the Estate, but the Order

23   was without prejudice to any equity interest Merritt may have in the Debtor.

24       17. In December 2919, PECAS transferred all its assets to Chabad, and had Chabad re-

25   transfer back to PECAS in or about January 2020 and PECAS re-transferred to Chabad in April 2020.

26       18.  Merritt, on behalf of himself, his creditors and investors, seeks a judgment that

27   determines his and their claims to and clouds upon title to real property, and water and mineral rights

28   incident to a Written Stipulation and Settlement Agreement executed by the Metropolitan Water

1    District ("MWD") in 1937, as against all known defendants, and also all other persons unknown

2    claiming any right, title, estate, lien or interest in the real property and water and mineral rights

3    described in the complaint as set forth below that are adverse to Plaintiff's ownership or any cloud

4    upon Plaintiff's title thereto and seeks Declaratory Relief to Quiet Title, and for Violations of

5    California Business & Professions Code ("B&P") § 17200 for an unlawful business practice and for

6    Actual Fraudulent Transfer.

7                           **COMPULSORY JOINDER OF CHABAD**

8         19. Under the rules of Compulsory Joinder for a just determination (FRBP 7019 incorporating

9    FRCP § 18) Chabad must be joined in the Adversary Proceeding as a Defendant because (A) it is the

10   transferee of the assets of PECAS that PECAS acquired unlawfully, fraudulently acquired from

11   LMMP, and (B) its joinder will not deprive the court of subject-matter jurisdiction (FRCvP

12   19(a)(1), and must be joined as a party because in its absence, the court cannot accord complete relief

13   among existing parties (FRCP § 19(a)(1)(A), and under FRCP § 19(a)(1)(B), Merritt's interest in the

14   1937 MWD Stipulation and his interest in LMMP pursuant to the Order of the Superior Court of

15   California, County of Riverside on July 7, 2015, were transferred to Chabad by PECAS in April

16   2020, the PECAS principals intimated, implied and inferred to Merritt in February 2020 that they had

17   some equitable controlling interest in the decision making of Chabad with respect to the LMMP asset

18   PECAS transferred to Chabad, Merritt's and his claims against PECAS for restitution are tangentially

19   related to his claims against Chabad as they relate to his claims for restitution, and are so situated that

20   disposing of the action in the absence of Chabad will, as a practical matter impair or impede Merritt's

21   ability to protect his interest and the interests of his creditors and interest holders (FRCP §

22   19(a)(1)(B)(i) or leave Merritt with a substantial risk of incurring double, multiple, or otherwise

23   inconsistent obligations because of the interest. (FRCP § 19(a)(1)(B)(ii))

24                                   **PARTIES**

25        20. Plaintiff Paul Merritt ("Plaintiff" or "Merritt") is, and at all times mentioned in this

26   Adversary Proceeding Complaint, was an individual, former limited partner of Lake Mathews

27   Mineral Properties, LTD, ("LMMP" or "Debtor" or "Debtor LMMP") and although having his

28   principal place of residence in Laguna Beach, County of Orange, State of California, Merritt has

1  regularly appeared in the Chapter 11 and Chapter 7 Bankruptcy proceeding challenging the actions

2  taken against LMMP.

3  ///

4      21. Defendant PECAS, LLC, is a Delaware Limited Liability Company, registered and

5  qualified to do business in the State of California under the name Pecas Property Holdings, LLC, a

6  California Limited Liability Company, and both entities have their principal place of business at

7  17606 Camino de Yatasto, Pacific Palisades, CA, 90272, and Reid Breitman, Esq. is the agent for

8  service of process at the same address.

9      22. Defendant The Chabad Temple ("Chabad"), is, a Jewish Temple in a form presently

10  unknown to Plaintiff's at this time, but has an address listed as 17315 West Sunset Boulevard, Pacific

11  Palisades, CA 90272-4101. Plaintiff will amend this pleading to include the actual business form of

12  Chabad Temple when the same is ascertained through applicable discovery. Merritt is informed,

13  believes and alleges that PECAS, in or about April 2020,  transferred to Chabad all of the right, title

14  and interest PECAS had in Lake Mathews Mineral Properties, Ltd, ("LMMPO"), that Merritt alleges

15  PECAS acquired through unlawful, deceptive, fraudulent and constructively fraudulent means and

16  through unlawful and unfair business practices of which Merritt alleges Chabad was aware based on

17  the relationship between the principals of PECAS and Chabad.

18      23. At this time, Merritt is ignorant of the true names and capacities of the Defendants sued

19  herein as DOES 1 through 100, inclusive, and therefore sues these Defendants by such fictitious

20  names. DOES 1 through 100 inclusive are all persons claiming any legal or equitable interest in the

21  property that is the subject of this action or whose joiner is required to resolve Merritt's claims

22  herein.  Each of the defendants designated herein as a fictitiously named Defendants 1 - 100 is, in

23  some manner, responsible for the events and happenings referred to and are liable to Merritt's  for

24  monetary damages.

25      24.  Merritt will amend this Verified Adversary Proceeding to allege the true names and

26  capacities of Does 1- 100 when ascertained. At all times mentioned herein, each of the Defendants

27  and DOE Defendants , whether individual, corporation, partnership, limited liability company, joint

28  venture, unincorporated association or other business entity of unknown form, and, or, whether

1 | named or sued by fictitious name, was the agent, servant, employee and, or, officer, director or

2 | partner of each of the other Defendants and in doing the things herein alleged, each of the Defendants

3 | were acting within the course and scope of such agency, employment or capacity with the permission

4 | and consent of all other Defendants, unless otherwise stated herein. For convenience, all references to

5 | Defendants, shall include the DOE Defendants, unless otherwise stated.

6 | 25. Each of the Defendants, whether individual, corporate, partnership, joint venture, limited

7 | liability company, unincorporated association, or other business entity of unknown form, and/or

8 | whether named or sued by fictitious name other than DOES 1- 100, is responsible in some manner

9 | for the damages suffered by Merritt; and, Merritt will seek leave of this Court to amend this Verified

10 | Adversary Proceeding to add additional causes of action and appropriate charging allegations,

11 | including additional claims when discovery reveals the true nature of the actions of all Defendants.

## GENERAL ALLEGATIONS

13 | 26. Lawrence Holmes dob 1865, the parent of James D. Holmes, came to the United States

14 | from Norway with his family as a child. In 1918, Lawrence Holmes, at a cost of several million

15 | dollars, acquired land in Riverside County on which to cultivate carob plantations, and constructed

16 | two dams forming two natural lakes for their maintenance - two of the five which he planned to

17 | create in the canyons. Some of Holmes' land was subdivided and leased to tenants who became small

18 | carob plantation owners.

19 | 27. By 1935 the dams Lawrence Holmes built along with the natural lakes came to the

20 | attention of the Metropolitan Water District ("MWD"), as the water course had the distinction to

21 | make the surrounding land fertile. MWD announced its intention to begin an immediate

22 | condemnation action of the carob plantations and the lakes before any meaningful hearing on the

23 | necessity for this action, and before an objective estimate of the value of the land condemned. The

24 | condemnation of the Holmes' land occurred and created the large reservoir on the condemned land,

25 | which became Lake Mathews. In the process, the MWD bulldozed 50,000, mature fruit-bearing carob

26 | trees, destroyed the dams and the lakes, drove the people living on the plantations from their homes,

27 | and destroyed their houses. Lawrence Holmes filed suit against MWD in 1936, in the Superior Court

28 | of California, County of Riverside which resulted in the longest trial in the then-history of the State

1  of California - one year and one day.

2      28. The condemnation displaced Lawrence Holmes and his family as they were enthralled in

3  the litigation. A stipulation was entered into in 1937 which awarded $575,000.00 to Lawrence

4  Holmes, the majority of which was consumed in legal costs and fees. On MWD's own initiative,

5  however, MWD also carefully drew a Stipulation which was entered into on April 21, 1937, taking

6  from the jury questions of the value of mining along with the mineral and water rights which had

7  been condemned and which the MWD decided to abandon and return to the Holmes family. The

8  Stipulation was affirmed in the  Judgment by the California Supreme Court in *Metropolitan Water*

9  *District v. E. Bennett Adams*, Case No. 26452.

10      29. The MWD Stipulation conveyed back to Lawrence Holmes, in fee simple, three

11  surface parcels to use as platforms for drilling and mining, clearly detailed that Lawrence Holmes

12  was given 800 acres of land 300 feet below the surface of Lake Mathews for purpose of extraction of

13  minerals, expressly agreed to mining operations of those 800 acres, assumed the risk of

14  contamination of water from such mining, assumed the obligation to protect, to the limits of its

15  capacity, those same mining operations from governmental interference which could be avoided or

16  minimized by its construction of required facilities for that purpose, granted the right to construct

17  underground passageways connecting mining areas, waived all rights to water which seeped under

18  the natural surface of 800 acres re-conveyed in connection with the drilling and mining operations

19  which the MWD could not itself recover, including all rights to water which might gush indefinitely

20  from the sinking of mines on those lands, and granted easements over MWD's property for private

21  rights-of-way of a specific width as reasonably required for exploitation of the mining, mineral and

22  water rights conveyed.

23      A. On March 12, 1939, Wright & Boydell Consulting Mining Engineering and

24  Geologists issued a report on the viability of mining tin under Lake Mathews, resembling the Cornish

25  tin Mines over the prior 250 years.

26      30. Lawrence Holmes died in 1950 and was survived by his son, James D. Holmes

27  ("Holmes") and heirs who were ultimately given their shares of the Lawrence Holmes estate, that

28  included all his, Lawrence Holmes right, title and interests in the 1937 MWD stipulation.

A. On or about December 5, 1980, Holmes sought and obtained a geological report from a Consulting Economic Geologist, A.R. Grant, Ph.D, which detailed a summary report and initial drill program recommendations as a preliminary step toward determining the economic potential of a tin-bearing zone on the Holmes share of the estate, concluding that the basic economic/geologic conditions for tin-mineralization was favorable, given the critical shortage of domestic tin reserves in the U.S., which placed potential tin deposits in high exploration demand .

B. Then, in 1983 Holmes formed, with others, LMMP to exploit the mineral and water rights conveyed in the 1937 Stipulation by MWD. Holmes and the heirs of the estate of Lawrence Holmes, transferred into LMMP all of his and their rights and interests in the 1937 MWD stipulation.

C. LMMP attempted its first core drilling in 1989 but MWD engaged extensive efforts to prevent any drilling, including claims of trespassing, or that drilling was dangerous.

31. Since the initial drill in 1985, LMMP engaged in continuous efforts to become fully capitalized to enable it to exploit the mining rights reconveyed in MWD's 1937 Stipulation.

A. On June 1, 2001, Prochnau-Soultherland Co., Consulting Mining Geologists prepared a report for Holmes to assimilate and summarize the opinions and judgments of past investigators in a single updated report regarding the viability of mining tin on the Holmes land, concluding in a nearly unanimous view that the Holmes properties remain prospective for tin-ore deposits which justifies more extensive and deeper exploration adjacent to and under Lake Mathews than has been carried out in the past in order to establish the true value of mining tin on the subject properties. The report concluded that past investigations have favorably compared the geologic features of the subject land for mining tin with the famed Cornwall district of Southwest England, where tin was produced for many centuries stating further that the investigations providing geologic evidence  supporting the potential for economic tin mineralization justifying further exploration.

32. In May, 2002, Holmes personally met with George Smith of George Smith Partners ("GSP"), for the purpose of exploring financing and capitalization of LMMP mining rights. LMMP is informed, believes and alleges that George Smith himself researched LMMP's rights granted by MWD's 1937 stipulation and communicated with his clients that investment in LMMP was "the most potentially lucrative investment" he had found in 40 years. In a Memorandum on May 20, 2002,

9

1   George Smith  wrote that he and his partners concluded that an acceptable settlement figure with the

2   MWD could spread between $50,000,000.00 and $500,000,000.00 and that probably a mid-point of

3   $250,000.000.00 to $300,000,000.00 was realistic.

4

5       A. Thereafter, reports were issued from Randal Evers, C.E., R.E.A, President and

6   CEO or Integrated Resources, Inc. and by law firm Dewey Ballanitne, LLP, on the viability of

7   mining on the land beneath Lake Mathews pursuant to the MWD 1937 stipulation detailing again the

8   necessity for additional exploration drilling.

9       B. The MWD continued to communicate with various representatives of LMMP

10  informing them that exploration of mining potential under Lake Mathews was dangerous to below

11  dam land owners for damage to the Lake Mathews dam and to water contamination.

12      C. On July 30, 2002, a supplemental report was issues stating that "LMMP did not

13  have to prove, to any court or government agency or to the MWD, that its mineral mining rights will

14  not create possibly unsafe conditions at Lake Mathews. Determination and resolution of safety

15  questions were and remain the sole responsibility of the MWD under the parties  Stipulation  - the

16  Contract. The MWD must make the appropriate determination; and, if it determines that its

17  Stipulation was ill-advised, and that it cannot perform its obligations thereunder because of safety

18  hazzards (or for any reason), then it must respond promptly for damages for breach of contract."

19      D. In or about November 15, 2012, John  Prochnau issued an outline for core drilling

20  to investigate the potential for tin deposits from the mineral rights on 864 acres on the Holmes land

21  under Lake Mathews which were similar to those in the historically productive Cornish area of

22  Southwest England.

23      33. While LMMP did not consummate a final agreement with GSP at that time, the LMMP

24  project became known to the investment community and through the years up through 2006, various

25  people and entities invested in an effort for LMMP to continue as a going concern.

26      34. In 2006, however, when LMMP attempted to take a core sample pursuant to MWD's

27  1937 Stipulation, the MWD refused to allow LMMP to continue its operations, stating that the

28  mining operations were much too dangerous, and that while the MWD's 1937 Stipulation granted to

1  Lawrence Holmes the "right" to exploit the mineral and water rights on the 800 acres 300 feet below

2  Lake Mathews, the 1937 Stipulation did not express or infer, directly or indirectly, that the owners of

3  such mineral rights "could" exploit such rights.

4  ///

5       35. Merritt alleges that MWD engaged in fraud and misrepresentation when they conveyed

6  back to Lawrence Holmes the rights to exploit all the mineral and water rights on the 800 acres at a

7  depth of 300 feet below the surface of Lake Mathews in MWD's 1937 Stipulation, when MWD

8  unequivocally knew and had discrete knowledge then, in 1937, that they, MWD never intended to

9  allow mining operations on the 800 acres at any depth below Lake Mathews to exploit such mineral

10  and water rights, and that they concealed a fact that they, MWD, refused to define, that the grant of

11  such mineral rights did not intend that the owner of such rights actually "could" exploit the rights

12  reconveyed.

13       36. LMMP lacked financial resources at that time to proceed directly against MWD for fraud,

14  constructive fraud, breach of contract and other various claims.

15       37. On January 12, 2007, Lawrence Holmes Senior Mining, Inc. ("LHSM") was formed and

16  Holmes was its President and Chief Executive Officer ("CEO").

17       38. On January 17, 2007, an Amendment and Restated Agreement of Partnership of LMMP

18  was ratified by LMMP limited partners and LHSM was instituted as its General Partner so long as

19  Holmes remained as the CEO. Shirley Smith, Esq. ("Smith") had been the attorney for Holmes for

20  the prior decade and became a director or LHSM and the Vice President of LHSM, and in-house

21  counsel for LHSM and LMMP; Holmes and Smith had equity interests in LMMP and LHSM.

22       39. In 2007, in accordance with the interest Jim Holmes had in the 1937 MWD Stipulation

23  that he transferred to LMMP, he, Jim Holmes, owned a interest in LMMP in the approximate amount

24  of 37.8818%.

25       40. In or about 2007, Holmes and Smith sought help from others to run LHSM, including

26  Merritt, a real estate broker.

27       41. In or about May 22, 2008, Holmes and Smith arranged for loans to them personally from

28  Perez totaling in two separate loan agreements, $60,000.00 to Holmes and $54,000.00 to Smith, also

1    granting Perez an 8% assignment of LMMP partnership interests.

2         42. At the same time, Holmes and Smith negotiated for Isaac Holdings, LLC ("Isaac

3    Holdings", a Perez company), to contract with LMMP to secure from MWD, access to its mineral

4    ///

5    rights in exchange for 25% percent of LMMP's most senior partnership interests entitling Isaac

6    Holdings, LLC a share in any distribution to LMMP from the proceeds of such mineral rights.

7         43. On August 28, 2008, LMMP's attorneys Baker & McKensey, negotiated with MWD, a

8    tolling agreement so the statute of limitations for LMMP to bring claims against the MWD would be

9    extended on an annual basis based on a continuing agreement, ratified in writing each year thereafter.

10        44. Holmes and Smith used all their time, energy and resources in an attempt to make LMMP

11   a going concern, but were consumed with the hurdles MWD continually threw in front of them to

12   thwart LMMP efforts, and they were unable to provide back the payments to David Perez.

13        45. The inability to provide re-payment to Perez precipitated a disruption in the relationship

14   between LMMP and Isaac Holdings which discontinued the activity of Isaac Holdings to facilitate

15   LMMP's mineral rights granted by MWD's 1937 Stipulation.

16        46. On June 7, 2010, Perez and Isaac Holdings filed suit against Holmes, Smith, LMMP and

17   LHSM ("Holmes parties"), in the Superior Court of California, County of Los Angeles, Case No. BC

18   439127, alleging that the agreements made with Holmes and Smith which included LMMP and

19   LHSM were repudiated.

20        47. On October 14, 2011, Holmes transferred to Merritt, one half of his, Holmes interests in

21   LMMP, or the approximate amount of 18.9409% of LMMP for his, Merritt's continuing efforts for

22   LMMP, and appointed Merritt as a director of LHSM, and as Vice President and Chief Financial

23   Officer ("CFO") of LHSM.

24        48. Previously, LMMP sought and obtained a loan from Robert Woody and his LLC, known

25   as Silverstrand of approximately $350,000.00. The loan was collateralized with a security interest in

26   the 625 acres of staging land surrounding Lake Mathews owned by LMMP granted in the 1937

27   MWD Stipulation. In the event that LMMP could not pay back the loan, Silverstrand could foreclose

28   on the approximately 62.5 acres.

Verified Adversary Complaint by Plaintiffs Paul Merritt against all named Defendants

49. In 2012, when LMMP was unable to pay back to Silverstrand the $350,000.00 loan, Silverstrand foreclosed on the 62.5 acres triggering the requirements in Article XVIV(d) of the 2007 LMMP LP Agreement, and LMMP was required to transfer back to the limited partners and and transferees', their individual right, title and interests they had as limited partners in LMMP.

50. Rather than doing so, however, unbeknownst to Merritt at the time, by on or about January 20 and 25, 2013, PECAS secretly coerced LMMP to enter into an unlawful arrangement with PECAS and acted in complicity to steal, embezzle, convert and unlawfully misappropriate Merritt';s 18.9989% interest in LMMP and the 1937 MWD Stipulation.

51. On August 3, 2012, A Stipulation for Entry of Judgment was entered between LMMP and Perez and Isaac Holdings in the case Perez and Isaac filed against Holmes and LMMP in Case No. BC 439127 ("Perez Judgment"), and the Stipulation required a $300,000.00 payment from LMMP. Nevertheless, the Stipulation for Entry of Judgment stated it could be redeemed if payment of $185,000.00 was made to Perez on November 26, 2012, and if such payments was not made, with a payment of $225,000.00 before midnight January 24, 2013; if full payment is made, Perez and Isaac Holdings would deliver back to the Holmes parties, their fully executed original certificates of the assignments of limited partnership interests they were provided.

52. LMMP had a meeting with a third party investor, Mr. Fong, was arranged for payment of the $185,000.00 to Perez prior to November 26, 2012. Merritt and his accountant, Nitin Shah ("Shah"), however, informed Smith that she was pledging as security and collateral for the $185,000.00 Fong investment, 110% of LMMP which was not lawful; the Fong investment was not thereafter arranged.

53. On October 31, 2012, Smith sent a letter to an LMMP attorney Michael Lawler regarding paying the Perez settlement with Merritt's help admitting in ¶12 of such letter that Merritt, to whom Holmes had conveyed one half of his own interest in the partnership in October, 2011, can handle Perez. Afterward, Smith asked Merritt to arrange for financing to pay off the Perez judgment, and Merritt than attempted to arrange such financing.

54. In or about the end of December, 2012, Holmes and Smith then met with a bankruptcy attorney, Theodore Stalman, in Century City regarding an Order for Relief seeking a discharge or

1  reorganization of LMMP's debts which was determined to be at that time not advisable. A meeting

2  was quickly then arranged for that afternoon with Gary Tenzer ("Temzer"), the then Managing

3  Director of GSP, as George Smith had passed in 2004. Holmes and Smith familiarized Tenzer with

4  the details of the Holmes saga as above described, including their prior communication with George

5  Smith in 2002, and the necessity to pay off the Stipulated Judgment in the Perez case for $225,000.00

6  by midnight, January 24, 2013. Smith also disclosed Merritt's involvement with LMMP,  that Merritt

7  was attempting to pay off the Perez judgment, and Tenzer represented that he would be in touch with

8  them.

9       55. In or about December 29, 2012, Holmes then granted to Brian Avery ("Avery")

10  approximately 51.28% of the Class C shares in LMMP, approximately 20% of LMMP, asking him to

11  help him manage LMMP pursuant to the January 2007 Amendment to LMMP; then Holmes

12  appointed Avery co-manager of LMMP.

13       56. In or about January 7, 2013, Merritt and Shaw communicated with Avery through e-mail,

14  informing Avery of Merritt using his property as security for a loan to pay off the Perez judgment,

15  and also requesting a formalization of Merritt's interest in LMMP, and requesting that Smith have

16  Holmes execute a formal conveyance of such interest to Merritt.

17       57. On January 8, 2013, Avery set up a meeting with Tenzer for the next day in Tenzer's

18  office at GSP. On January 9, 2013, Tenser met again with Holmes and Smith, and Avery, and with

19  other member of GSP including Omer Ivanir ("Ivanir") for the purpose of obtaining the $225,000.00

20  to pay the Perez judgment before midnight, January 24, 2013. Smith thereafter claimed that Tenzer

21  had with him the file which had previously been prepared by George Smith of GSP with respect to

22  the research George Smith himself had previously undertaken for investment into LMMP.

23       58. On January 9, 2013, a Certificate of Formation for PECAS was filed in the office of the

24  Secretary of State for Delaware. (Smith, Holmes and Avery subsequently represented they had no

25  knowledge of the January 9, 2013 PECAS formation.)

26       59. On January 10, 2013, Smith faxed the LMMP register to Avery showing the interest or

27  points each limited partner had in LMMP, which also showed that Merritt and Holmes each had

28  18.9409 Class A shares in LMMP.

60. On or about January 11, 2013, Merritt again requested that Holmes and LMMP send him written acknowledgment of his 18.9409 Class A interest in LMMP.

61. On January 14, 2013, Smith sent an e-mail to Merritt asking him to raise the $225,000.00 needed to pay off the Perez judgment and he should contact Avery for assistance.

62. On or about January 15, 2013, Merritt, however, claimed that Avery represented to him that, "the attorneys on our side say your shares are unenforceable." Merritt is informed, believes and alleges that the attorneys of whom Avery was making reference were the attorneys for DSP and Reid Breitman, Esq., one of the principals of PECAS.

63. On January 17, 2013:

A. There was continuous communication between Shah, Merritt and Avery regarding the $225,000.00 to pay off the Perez judgment; and,

B. Communication between Merritt and Avery that Smith will not reveal to him, Merritt, who she has as a new angel investor working through Avery's office, but the concealment of such data and takeover is and would be wrong; and,

C. D. Jonathan Hadaya ("Hadaya"), the Perez attorney, put Merritt in communication with Perez; and,

D. Avery informed Tenzer that he had spent the evening in the law library and had reviewed every document and fax Smith had sent to him, which LMMP alleges would have included the LMMP register showing Merritt and Holmes with the identical 18.94 interest in LMMP; and,

E. Avery communicated with Tenzer, Ivanir and others at GSP attempting to negotiate a proposal that they, Tenzer and Ivanir would obtain an investor to pay off the Perez judgment of $225,000.00, for which LMMP would give GSP 3 points in the new venture, Tenzer would be given 2 points in the new venture, and the new investor given 25 points in the new venture.

64. On January 18, 2013, Merritt informed Avery that LHSM was suspended, and that he required collateral for his personal loan of $225,000.00 pay off the Perez judgment by midnight, January 24, 2013.

65. On the same day, January 18, 2013:

A. Merritt's attorney, Frank Cardinale ("Cardinale") sent a letter to LMMP and

1  Holmes demanding Merritt's interest in LMMP.

2          B. Smith and Holmes refused to give Merritt any collateral if he, Merritt, was able to

3  arrange for his personal funding of the $225,000.00 to pay off the $225,000.00 Perez judgment.

4  ///

5          C. Merritt informed Avery that of the three banks who would have given him a loan,

6  now, only 1 ½ half remained to do so.

7          D. Avery informed Ivanir that Smith and Holmes were concerned that if the

8  $225,000.00 was not paid by the January 24, 2013 deadline, Perez would take over LMMP..

9      66. Tenzer and Ivanir arranged a meeting for January 20, 2013 with Tenzer, Ivanir, Breitman,

10  Smith, Holmes and Avery.

11      67. In the January 20, 2013 meeting, it was allegedly agreed that:

12          A. A new entity would be formed (PECAS - already previously formed on January 9,

13  2009) in which LMMP would be a partner; and,

14          B. The new entity would pay off the $225,000.00 Perez judgment; and,

15          C. Documents would be drafted to be signed to detail the conditions of the new

16  partnership; and,

17          D. LMMP would only have 25% of the new partnership rather than as Avery was

18  negotiating that the new investor would have 25% of LMMP.

19      68. On January 21, 2013, Tenzer and, or, Ivanir had a one page proposal prepared regarding

20  the January 20, 2013 and sent it to Avery.

21      69. The proposal stated:

22          "Per our discussion at our meeting on Sunday, January 20, 2013, this
            memo will confirm our agreement regarding compensation to George
23          Smith Partners, Inc. ("GSP") and Gary M. Tenzer ("Tenzer") for
            arranging the financing with Reid Breitman ("Investor"). LMMP
24          agrees to execute binding agreements with GSP and Tenzer
            documenting the agreement to effectuate the payment from proceeds of
25          any settlement with the Metropolitan Water District or any other source
            of case payments to LMMP (or to the new to-be-formed agreement
26          between LMMP and Investor). It is acknowledged that said distribution
            is subordinated to the return of all costs advanced by Investor with a
27          10% return on case advanced."

28      | Settlement | Investor | LMMP | GSP | Tenzer |

Verified Adversary Complaint by Plaintiffs Paul Merritt against all named Defendants

| | | | | |
|---|---|---|---|---|
| $0-$50M | 70% | 25% | 2% | 3% |
| $50M-$100M | 65% | 30% | 2% | 3% |
| $110M-$200M | 45% | 50% | 2% | 3% |
| $200M Plus | 25% | 70% | 2% | 3% |

70. Avery received this printed proposal in the late morning of January 21, 2013, and hurried to have Smith and Holmes sign it that day in which LMMP would loose 75% of its assets.

71. On January 22, 2013, Nitin Shah inquired of Avery if LMMP had the $225,000.00 to pay off the Perez judgment or if he, Avery would be assisting Merritt with Avery's bankers to borrow the funds secured against Merritt's property.

72. Merritt through his broker Mary Paterson in Mission Viejo, California, had the documentation prepared which pre approved Merritt for the $225,000.00 loan from various lenders secured by several pieces of Merritt's real property.

73. On January 23, 2013, Avery sent to Tenzer the information regarding the toling agreement that LMMP had arranged with the MWD on August 28, 2008 though Baker & McKenzie to be extended each year, the next extension due on August 28, 2013.

74. In the evening of January 23,2013, at 11:18 p.m., Bryce Overand ("Overand") working with GSP, Tenzer and Ivanir, sent an e-mail to Tenzer informing him that he would file the deed of trust for LMMP in the Riverside County Recorder's Office tomorrow morning.

75. On January 23, 2013, between 11:30 p.m. - 11:33 p.m., Tenzer and Ivanir communicated through e-mail about still negotiating terms and conditions regarding the transfer rights as to LMMP's assets with Avery in the evening of January 23, 2013 just before midnight.

### The January 24, 2013 PECas Adhesion Contracts

76. On January 24, 2013, prior to Smith and Holmes reading and signing the PECAS agreements to transfer the LMMP asset, PECAS had Overand file in the Riverside County Recorder's Office, the Deed of Trust regarding a transfer of LMMP assets at 12:12 p.m.

77. In the afternoon of January 24, 2013, Merritt, without an agreement from LMMP for repayment, tendered a check to Perez for $225,000.00 by having it delivered to Hadaya's office to

///

1    satisfy the Perez Judgment; the $225,000.00 check was tendered for the benefit of the resolution and

2    settlement of the Perez case.

3        78. The Perez judgement identified the Holmes parties as Holmes, Smith, LMMP and LHSM

4    and the Perez parties as David Perez and Isaac Holdings, LLC. The Perez judgment stated that a

5    representative of the Holmes parties can pay the $225,000.00 to satisfy the Perez judgment. Merritt

6    was a representative in his status as director, and CFO and Vice President of LHSM. The Perez

7    judgment stated that when  the $225,000.00 was timely paid, the Perez parties will provide back to

8    the Holmes parties, all the property they received to secure the loans from Perez and work of Isaac

9    Holdings, and transfer back the certificate of partnership interests to the Holmes parties; (not to the

10   payor or representative who paid the $225,000.00 for the Holmes parties).

11       79. Avery represented that in the middle of the afternoon on January 24, 2013, he, Smith and

12   Holmes met with Tenzer, Ivanir and Breitman to sign the agreements to formalize the new

13   partnership identified in the January 21,2013 proposal, in which the investor in the new entity would

14   provide a check for $225,000.00 to pay off the Perez judgment due by midnight that day on January

15   24, 2013. Smith and Holmes represent that Tenzer called Smith and Holmes first in the afternoon of

16   January 24, 2013, then in the early evening of January 24, 2013, informing them that Merritt was on

17   his way to San Diego to pay the $225,000.00 and buy the Perez Judgement, but he, Tenzer and his

18   partners had something that might help and they needed to come to his office before Merritt took

19   over LMMP.

20       80. Sometime from the middle of the afternoon on January 24, 2013, Smith, Holmes and

21   Avery went to the office of Tenzer; it is alleged that Ivanir and Breitman were present. Knowing the

22   Merritt;s involvement in LMMP disclosed by Smith, Holmes and Avery to Tenzer as described

23   above, and knowing Holmes had given Merritt one half of his interest in LMMP, and that LMMP

24   faced possible loss of its rights granted in MWD's 1937 stipulation, Tenzer, Breitman and Ivanir

25   offered just $225,000.00 to buy the Perez judgment and coerced LMMP into giving it ownership of

26   all of LMMP's rights conveyed in MWD's 1937 Stipulation, granting back to LMMP, only 25% of

27   the new entity in which LMMP would be a 25% partner.

28   ///

Verified Adversary Complaint by Plaintiffs Paul Merritt against all named Defendants

1    81. That new entity was PECAS, LLC, a Delaware LLC which was formed on January 9,

2    2013. Effectively, rather that paying Perez the $225,000.00 and succeeding to the 8% LMMP had

3    given to Perez and the 25% LMMP had given to Isaac Holdings totaling 33%, Tenzer, Ivanir and

4    Breitman demanded LMMP transfer 100% of its assets to PECAS and gave LMMP only 25% of

5    PECAS and PECAS took back 75% in accordance with the alleged proposal created on January 21,

6    2013 from the January 20, 2013 meeting. Merritt alleges that in the context of the distressed financial

7    context LMMP found itself between January 20, 2013 and January 24, 2013, , it was unethical,

8    unconscionable and unlawful for PECAS to demand more than the 33% Perez and Issac Holdings

9    owned in LMMP; demanding an additional 42% interest in LMMP beyond the 33% owned by :Perez

10    and Issac Holdings was unethical and unlawful.

11    82. Sometime during the afternoon (after 3:00 p.m.) or evening of January 24, 2013, Tenzer,

12    Breitman and Ivanir presented Holmes and Smith with a large bundle of documents ("PECAS

13    documents") regarding the formation of PECAS, which included, but were not limited to:

14        A. A seven page Asset and Purchase Agreement dated January 23, 2013, with

15        (i) the assets described in the " Description of Property" attached in its Exhibit A,

16        (ii) the Grant Deed attached in its Exhibit B, and tangible and intangible assets,

17        (iii) including the Bill of Sale attached in its  Exhibit C,

18        (iv) permitted exceptions attached in its Exhibit D,

19        (v) the three page PECAS Operating Agreement for Buyer dated January 9, 2013,

20        (vi) in the form attached in its Exhibit E, and an assumption of the Perez Judgment

21    attached in its Exhibit F; and,

22        B.  The Certificate of Formation of PECAS on January 9, 2013; and,

23        C.  The 39 page PECAS Amended and Restated Operating Agreement dated January

24    25, 2013; and,

25        D. Asset and Purchase Agreement and Bill of Sale of LMMP' assets dated January 23,

26    2013 with multiple pages of title documents; and,

27        E. The Three Page Approval and Consent of LMMP's Limited Partners dated January

28    23, 2013; and,

F. Assumption of the Perez Judgment dated January 23, 2013,

G. An agreement dated January 24, 2013, that if LHSM was not reinstated by the Secretary of State (as it had been suspended since December 29, 2010), James D. Holmes would grant to Poseidon and Holdings, 25% of the partnership interests James D. Holmes and LHSM owned in LMMP.

83. In the January 24, 2013 time frame, no Capitol Accounts statement showing the required percentages of partnership, debts, debits, credits and expenditures of LMMP has been found to have been created by LMMP, LHSM or by PECAS or its principals.

84. The PECAS documents expressly make it appear that Holmes decided to and created all the PECAS documents; and,

A. Actually formed PECAS on January 9, 2013; and,

B. Created the initial PECAS Operating Agreement as of January 9, 2013 with LMMP as the initial member of PECAS, and James D. Holmes was the Original Manager of PECAS; and,

C. Created the 39 page Amended Operating Agreement of PECAS dated January 25, 203, in which Lake Mathews Holdings, LLC, a Delaware Limited Liability Company ("Holdings") was to be the Additional Member of PECAS, and Lake Mathews Holdings, LLC was to provide the financing to resolve the Perez judgment and provide management resources through Poseidon Capitol, LLC, ("Poseidon") which was to be the new manager of PECAS, and Reid Breitman and Omer Ivanir were the co-managers of Poseidon, and GSP was a Class C Unit holder, and LMMP was to transfer one hundred (100%) of its entire assets into PECAS. PECAS and Holdings are effectively PECAS.

85. The PECAS Amended Operating Agreement only gave LMMP a 25% interest in PECAS which entitled LMMP to receive distributions allegedly in the escalating amounts stated in the one page agreement allegedly made on Sunday, January 20, 2013.

86. The PECAS documents expressly prohibited LMMP or its principles from communicating with anyone, including MWD, and expressly granted PECAS the right not to communicate with LMMP and its principles in any way about any effort or decisions PECAS made or was considering with respect to assets transferred by LMMP.

87. Merritt is informed, believes and alleges that the PECAS principals:

A. Acted with the multi nefarious intent of their ingenuity, and pressured Holmes and Smith with intended artifice and connivance, to accept the PECAS adhesion contract documents, take it or leave it, and exercised wrongful mental coercion over them in a manner which destroyed their free will in the context of the transaction which resembles menace.

B. Expressly represented to Holmes, Smith and LMMP on January 24, 2013, that they must read sign all the PECAS documents, and, "take it or leave it", and if they did not sign the documents, their interests in LMMP would be lost, and either Merritt or Perez would take all or the majority of LMMP.

C. Left Holmes and Smith dominated with the pressure of implied threats of being subjected to securities law violations from the Perez complaint which the PECAS principals knew implicitly, and leaving them with no negotiating room, and the pressure exerted on Holmes and Smith was sufficiently coercive to cause them to succumb to the pressure and sign the PECAS documents.

88. Merritt is informed, believes and alleges:

A. The $225,000.00 Check from Merritt was delivered to Hadaya's office in the early afternoon of January 24, 2013;

B. LMMP signed the PECAS adhesion contracts in the early evening of January 24, 2013, and transferred its assets to PECAS;

C. Breitman, Ivanir and Tenzer facilitated a payment of $225,000.00 from a consortium of investors and had such funds given to Hadaya by Ivanir at approximately 8:30 p.m. in the evening of January 24, 2013 to pay the Perez judgment, nearly 10 hours after the $225,000.00 payment was provided to Hadaya by Merritt's $225,000.00 check.

D. The LMMP partnership certificates of Perez and Isaac Holdings were transferred back and became part of PECAS in or about January 29, 2013 or sometime thereafter;

89. Merritt is informed, believes and alleges that PECAS and its principals knew Merritt was attempting financing to enable LMMP to pay off the Perez judgment and knew Holmes had giveen Merritt one half of his interest in LMMP and the 1937 MWD Stipulation and intended to have

1  Merritt removed from having any interest in LMMP that would interfere with the design of PECAS

2  to control the majority of the 1937 MWD Stipulation PECAS induced LMMP to give to PECAS.

3      90. Merritt alleges Smith was confused and made material mistakes of fact which was

4  exacerbated by undue influence being exerted upon her through artifice and the disclosures she made

5  to Tenzer that rendered LMMP and its asset am exploitable mark.

6      91. Smith had a long distinguished career, but was 80 years of age in January, 2013, and she

7  was impaired with chronic pain which confused her understanding of the legal and factual concepts

8  presented for her to give adequate legal advise to LMMP and Holmes who relied on her for all their

9  legal and financial decisions, which the PECAS principals knew, or reasonably should have known

10  since the first meeting Smith had with Tenzer in December, 2012.

11      92. In the context of January 24, 2013,  Holmes and Smith did not understand the language in

12  the PECAS documents, did not have time to read and understand the legal effect of signing the

13  documents, and did not have the means to employ or consult with other legal counsel, and Smith

14  needed help but could not afford to retain such legal assistance all of which was known by the

15  PECAS principals since the first meeting with Tenzer in last part of December, 2012.

16      **The Fraudulent PECAS Approval and Consent Documents for LMMP's Partners**

17      93. The three page Approval and Consent of Limited Partners of LMMP in the PECAS

18  documents merely referred to the Perez Judgment, and did not contain sufficient express explanations

19  for the limited partners to comprehend or understand that the Perez Judgment was had for the failure

20  of repayment of the personal loans to Holmes and Smith. In this regard, the PECAS documents

21  intentionally misrepresented the facts or at the very least, mislead the limited partners from whom a

22  ratification of the LMMP/PECAS agreement was requested, as to the complete facts of the Perez

23  Judgment. The misleading and, or intentional misrepresentations of the facts to the limited partners

24  of LMMP created a failure of consideration for LMMP in the LMMP/PECAS agreement and vitiates

25  the consent of the limited partners who executed the approval forms, which were dated January 23,

26  2013, but not executed until weeks afterward.

27      A. The PECAS documents also falsified the points or interest of the individual LMMP

28  interest holders requested to execute the approval and consent forms, making it appear in the

1    approval documents that Holmes had a total of 44.39% of Class A points or interest in LMMP,

2    completely voiding the Merritt's interest as he was informed by Avery on January 15, 2013, that

3    "the attorneys on our side say your shares are unenforceable." LMMP is informed and believes and

4    alleges that the phrase "the attorneys on our side" referred to the attorneys representing Tenzer,

5    Breitman and Ivanir and, or, were preparing all the PECAS documents; and, these PECAS documents

6    were crafted to make it appear that there were sufficient votes of all the limited partner interest

7    holders to approve and consent to the transfer of LMMP assets to PECAS.

8           B. PECAS further manipulated the approval and consent forms which were signed by

9    Smith representing her signature as having 28.21% of Class C points or interest  and signed by Randy

10   C. Evers as Trustee of Evers Family Trust as having 100% of Class C points or interest, when Brian

11   Avery was given 51.28 % of the Class C points or interest in LMMP on December 29, 2012.

12          C. PECAS further manipulated the approval and consent form by not sending an

13   approval form to the Klover trust, the trustee of which was Paul Merritt, in which Klover trust loaned

14   $35,000.00 to LMMP in consideration for 1% Class D interest in LMMP.

15   **The Avery and PECAS Conspiracy to Steal, Convert and Embezzle  Merritt's Shares**

16          94. PECAS interfered with the rights of the shareholders in LMMP by informing Holmes and

17   Smith that Merritt's 18.9409 Class A shares in LMMP were unenforceable to prevent Merritt from

18   voting against the approval and consent of the LMMP/PECAS agreement, which would have

19   precipitated the conditions under which Perez would have been required to negotiate the $225,000.00

20   tendered from Merritt rather than the $225,000.00 from PECAS.

21          95. On January 28, 2013, Avery sent a fax to Overand containing the January 18, 2013 letter

22   from Merritt's attorney demanding his, Merritt's interest in LMMP.

23          96. On January 28, 2013, Ivanir tried to immunize PECAS by communication with Avery

24   requesting any other documents or information which might negatively impact Smith and Holmes, or

25   whether there was anyone else claiming an interest in LMMP, or any law suits or judgments.

26          97. On January 29, 2013, Avery communicated with Tenzer, Ivanir and Overrand allegedly

27   informing them about Merritt for the first time, although Smith and Holmes stated they had so

28   informed Tenzer about Merritt in their first meeting with him at the end of December, 2012. Merritt

1  was also noted as a director on the Statement of Information with the California Secretary of State

2  of which LMMP alleges the PECAS principals had knowledge from simple required due diligence.

3  Avery informed the PECAS principals that he revealed no information to Merritt and his accountant

4  as they were finalizing another LMMP litigation, but he, Avery intends no further communication

5  with Merritt and his accountant, Shah.

6       98. On January 30, 2013, Avery sent a fax to Ivanir, regarding all the information he had on

7  LMMP investors, shareholders and service providers  which showed Merritt and Holmes each with

8  18.94% in LMMP, and the final demand of Merritt for his interest in LMMP.

9       99. On February 4, 2013, Avery sent a fax to Smith stating, "Here is a list of LMMP

10  participants with Merritt in the partner's box at the bottom directly below Jim. Both Paul and Jim are

11  listed at 18.94% as Partners This must be corrected and I am glad to bring this to your attention."

12       100. On February 5, 2013, Smith sent a fax to Avery with a new participants list, in which

13  Merritt's name was removed from being in the Class A partners, and only noting that Merritt had

14  0.033 points for the $35,000.00 investment of Klover trust.

15       101. LMMP alleges that if for any reason Avery and Smith wanted to have Merritt's interest

16  declared void, they were required to file an action in Court under Corporations Code § 16405(a) for

17  LMMP or § 16405(b)(1)-(2) for Smith and Holmes. Rather than doing so, PECAS, through Ivanir,

18  Avery and Smith, intentionally avoided the legal requirements, and simply took Merritt's interest in a

19  theft and civil conversion in the meaning of *Second Measure, Inc. v. Kim* (ND Cal. November 10,

20  2015) 143 F.Supp.3d 961  The theft and civil conversion of Merritt's interest was theft by PECAS,

21  through Ivanir, Avery and Smith in which they gave Merritt's interest to Holmes intended to allow

22  Holmes to have sufficient points or interest to sign the consents, approval and ratification documents

23  which PECAS created f of the January 24, 2013 PECAS adhesion contracts. LMMP alleges that even

24  intangible property such as corporate or partnership shares, interests and, or,  bonds may be the

25  proper subject of a conversion claim.

26       102. Merritt and Shah tried to have a conference call with PECAS and its principals and

27  Avery which was continually delayed until after February 20, 2013.

28  ///

Verified Adversary Complaint by Plaintiffs Paul Merritt against all named Defendants

1    103. On February 12, 2013, Shah sent an e-mail to Avery @ 9:03 a.m.

2    A. Questioning how he, Avery, as co-manager of LMMP, can ignore Merritt, an

3    LMMP class A and Class D partner and his request for basic information; and,

4    B. Avery immediately forwarded the e-mail to Tenzer, Ivanir and Overand on

5    February 12, 2013 stating, "hello guys, FYI"; and,

6    C. Avery sent another immediate e-mail to Tenzer, Ivanir and Overand  on February

7    12, 2013, asking, "Has Jim signed the approval and consents;

8    D. To which Overand responded to Avery, Tenzer and Ivanir on February 12, 2013,

9    "Yes he has. He was the first one to sign;"

10    E. To which Avery replied to Tenzer, Ivanir and Overand on February 2, 2013,

11    "Thanks, that is a big relief."

12    104. After these firs e-mails from Avery to and from Tenzer, Ivanir and Overand, on February

13    12, 2013, and after Avery's receipt of the LMMP register records from Smith showing Merritt and

14    Holmes with equal 18.94% interest in LMMP which Avery shared with Tenzer, Ivanir and Overand,

15    and after Avery informed Smith that they had to get Merritt's shares out of the LMMP share register,

16    Avery then subsequently sent an e-mail to Shah on February 12, 2013 stating, "I was not aware that

17    Paul was a Class A and Class D partner. Please provide me with documentation documenting his

18    ownership and I will speak with Jim and Shirley about arranging for an inspection as soon as

19    possible."

20    105. On February 13, 2013, Shah sent an e-mail to Avery, responding to Avery's February

21    12, 2013 e-mail stating, "How surprising that you are not aware of his Class A holding. Paul has

22    already given you some documentation of his conveyance of half of Jim's shares. Shirley has the

23    papers of his Class D allotment. Merritt then sent an e-mail to Avery in the evening of February 12,

24    2013 at approximately 8:30 p.m., informing Avery of his Class A and Class D shares ad Smith's

25    knowledge of such.

26    106. On February 15, 2013, Smith sent a fax to Avery, Ivanir and Overand concerning

27    Merritt's listing at 18.94% informing them that Merritt did nothing to obtain those shares.

28    ///

Verified Adversary Complaint by Plaintiffs Paul Merritt against all named Defendants

107. On February 19, 2013, Ivanir sent an e-mail to Tenzer, Overand and Avery asking for a quick summary table on the consents needed for the approval, and how far they were from a majority.

108. On February 20, 2013:

A. Overand responded, "Good progress, but we aren't at 50%, and no where near it if Jim conveyed half of his Class A membership to Merritt; and,

B. Overand then sent another e-mail to Avery, Ivanir and Tenzer stating that while they have consents from Holmes at 44.3934%, if Holmes did convey half his Class A interest to Merritt, then we will not be able to get over 50% of the consent; and,

C. Merritt thereafter tried to communicate with LMMP shareholders regarding the fabrication in the approval and consent forms; and,

D. Thereafter, on March 13, 2013, Merritt's positions as an officer and director of LHSM was rescinded effective that day.

109. PECAS, Avery, Smith, Ivanir, Tenzer and Breitman precipitated in concerted activity to shut Merritt out of both LHSM and LMMP to facilitate the theft, embezzlement and civil conversion of Merritt's interest in LMMP in the meaning of *Second Measure v. Kim*, supra, as they knew Merritt would have objected to the consent and approval, block the consent and approval, and to facilitate the consents and ratification of the PECAS January 24, 2013 adhesion contracts to be ratified and approved by the LMMP shareholders. By shutting Merritt out of LHSM and LMMP, LMMP lost 75% of its assets to PECAS and its principals from the above addressed unlawful activity.

110. Merritt filed suit against Holmes and LMMP on August 13, 2013, to obtain his shares in LMMP in the Superior Court of California, County of Riverside, Case No. RIC 130928.

111. On July 7, 2015, the RIC 1309386 Court entered an Order on Settlement in which Merritt was given back an 18.9989% class D interest in LMMP with a minimum stated value of $250,000.00 and the Court retained jurisdiction over any settlement disputes. LMMP was then required to act in accordance with Article XVIV, to enable its limited partners to receive back their interests in the 1937 MWD Stipulation, the mineral and water rights, wind up its affairs.

## The Adam Telanoff, Esq., Ernst Muusse and PECAS Principals Conspiracy

112. After the January 24, 2013 PECAS adhesion contracts were signed by Smith and Holmes continued to run LMMP out of their apartment in Marina delRey, California.

113. Ernst Muusse ("Muusse"), the son of Smiths former husband, was assisting Smith, and became LMM's business director, responsible for maintaining LMMP records, files and documents and for obtaining funding for LMMP which Smith and Holmes used. From approximately March, 203 through November, 2013, Muusse facilitated approximately $62,500.00 in new loans which were signed for by LMMP.

114. On September 14, 2014, Holmes signed a document giving Muusse 10% of any gross profits which LMMP was to receive.

115. On or about January 20, 2015, Muusse was able to secure the services of Adam Telanoff, Esq. ("Telanoff") to substitute in as the attorney of record in place and instead of Smith representing Holmes and LMMP in Merrit's action, RIC 130928. Telanoff, through Muusse, was able to arrange for his attorney compensation as 5% of any proceeds which LMMP was ultimately to receve from PECAS.

116. At the end of January, 2015, Smith and Holmes secured the services of Steven Winstead ("Winstead"), David W. Clancy, Jr. ("Clancy"), and Terrence O'Hearn t("O'Hearn") to help Smith and Holmes run LMMP's general partner, LHSM.

117. In or about March, 2015, after review of LMMP records and communication with Muusse, Winstead suggested that in light of the multitude of investors, creditors and overselling of LMMP points or interest by somewhere between 160% - 300%shares, a Chapter 11 proceeding appeared appropriate. Muusse refused, concerned that his 10% interest of the LMMP gross profits would be lost. Muusse then began communicating with PECAS co-manager, Ivanir.

118. On June 1,2015, Telanoff signed a substitution of attorney form and Smith substituted back in for Holmes and LMMP in the Merritt action, RIC 130928.

119. On June 20, 2015, Smith demanded of Telanoff all the LMMP documents and files Telanoff possessed in the Merritt action.

///

120. On June 24, 2015, Smith also terminated Telanoff from representing LMMP in the action filed against LMMP by Martin Hudler and his company Bridgeport Management, Inc, in the Northern District, Case No. CV 14 0070 VC, demanding a return of all the documents Telanoff possessed.

121. As stated above, on July 14, 2015,  Merritt's claims against LMMP and Holmes in RIC 1309386  were settled after Smith and Holmes capitulated that Homes had previously given Merritt one half his shares on October 14, 2011.

122. The Settlement Agreement recites Merritt for consideration was previously granted a total of 18.9409 limited partnership points/shares in LMMP.

123. The July 14, 2015 Settlement Agreement and Court Order was filed as Riverside Superior Court Order in Case No. RIC 130928 on July 14, 2015, and recorded thereafter.

124. The Riverside Superior Court left the case open for LMMP to decide if they would move for an Order to file a Cross Complaint for rescission against PECAS, and for Merritt to decide if he would file an action against PECAS. LMMP made a decision to act to rescind the PECAS/LMMP agreements of January 2013, so that it could wind up its affairs pursuant to Article XVIV and return to the individual limited partners, their assignees and transferees', their interests in the 1937 MWD Stipulation.

125. On July 16, 2015, LMMP sent PECAS and Breitman a letter notifying them of a dispute LMMP had for the unconscionable PECAS adhesion contracts.

126. In a telephone conference between Breitman and LMMP's counsel thereafter, Breitman admitted that a Judge may agree that PECAS may not have given Smith and Holmes enough time to read the agreements.

127. Then, on July 22, 2015, Muusse sent an e-mail to Ivanir and Telanoff staing:

"To Omer Ivanir
"CC:  Adam Telanoff

"Hi Olmer.

"Thank you for your thoughtful call.

"I called Adam and conveyed our conversation of a few minutes ago. His response is below.

"Let me add one point of emphasis: Terry, Jim and Shirley know nothing of the dissolution Adam and (he) are working on. We feel that this course of action, dissolution, needs to remain quiet, at least until we had a chance to resolve several points, not the least of which is the issue of our understanding of the sale. Please keep the dissolution effort of Adam's work confidential at this point.

" Let me add one request/suggestion: By requesting a meeting in the first week in August to just examine the best path forward for everybody you will both delight and encourage Terry and company and move them in the positive direction discussed. Just scheduling that meeting will do it all.

"I meet informally with Terry several times a week so I can listen, reinforce his constructive efforts and provide moral support between now and then.

"Terry O'Hearn # 310 748 5437.
" All the best

"Ernst."

128. In July, 2015, Holmes attempted to appoint Winstead, Clancy and O'Hearn to the LHSM board but did not properly complete all the Corporate Resolutions and requirements for such.

129. Muusse, Ivanir and Telanoff then set up a meeting for August 2, 2015 with Breitman to formulate the strategy to dissolve and demise LMMP rather than to seek a negotiated settlement between LMMP and PECAS relative to the dispute of which LMMP had informed PECAS on July 16, 2015.

130. On August 16, 2015, Holmes signed the formalized LHSM Corporate Resolutions and appointed Steven Winstead as Director and Senior Vice President and General Manager of LHSM, David W. Clancy, Jr. as Director and Vice President and Secretary of LHSM, and Terrence O'Hearn as Director and Treasurer and Chief Financial Officer of LHSM.

131. After a review of the documents attesting to the above, LHSM decided to protect the rights of LMMP's creditors, investors and limited partners and sought resolution of the above controversy. Holdings was then filed as a California LLC on August 27, 2015. On August 28, 2015, PECAS refused resolution with LMMP and LMMP served Notice of Rescission on October 8, 2015.

132. In October, 2015, LMMP served PECAS with a motion to file a Cross Complaint in Case No,  RIC 130928  for Rescission of the January 24,, 2013 PECAS adhesion contracts.

///

A. On November 5, 2015, Smith signed a declaration that she did not have sufficient time to read the PECAS documents but that she understood PECAS would extend the tolling agreement and immediately file suit against the MWD. On November 5, 2015, Smith as Holmes attorney, signed a similar declaration for Holmes which also states that Homes had cataracts at the time and could not read the documents, and did not have time to understand the documents. Smith and Holmes reside together in Marina dell Rey, California. On November 9, 2015, Holmes signed his own declaration that Smith previously signed for Holmes on November 5, 2015.

B. After being serv ed with the LMMP Motion and Proposed Cross Complaint, PECAS did an end run after being served and filed a complaint for Declaratory Relief on November 12, 2015 in Los Angeles Superior, Stanley Mosk Court House, Case No. BC 600724, naming LMMP, LHSM, Smith and Holmes as defendants.

C. LMMP filed its Answer and Cross Complaint on January 15, 2016; Smith and Holmes have not filed a responsive pleading.

133. Muusse and Telanoff continued to communicate with PECAS and its counsel, David Myers, Esq. ("Myers") during the litigation of BC 600724, which Muusse was still a business director of LMMP..

134. Myer's subpoenaed Telanoff for deposition and production of documents.

135. LMMP objected to the deposition of its former attorney.

136. Telanoff then conducted legal research for Myers and PECAS, informing them in e-mails that LMMP ceased to exist and that LHSM could no longer be the general partner of LMMP, and there was no person who had the authority to retain counsel for LMMP or LHSM. Telanoff then appeared at his deposition with three bankers boxes of documents totaling over 10,000 pages which he had previously refused to provide back to Smith of current LMMP counsel.

137. Muusse gave Myers a box of LMMP documents he refused to previously give back to Smith or LMMP when the same were demanded of him.

138. On March 10, 2016, Myers admitted that he had received the LMMP documents from Muusse prior to the time that he, Myers, served a Deposition Subpoena for the Production of

///

Verified Adversary Complaint by Plaintiffs Paul Merritt against all named Defendants

1   Business Records, had not previously so informed LMMP counsel, but refused to disclose the date

2   and time of his communication with Muusse, and the full extent of their discussions.

3       139. During discovery, that included admissions of PECAS collusion, LMMP was confident

4   that it could obtain rescission but was facing financial pressures, and multiple suites from its limited

5   partners, including Paul Merritt, for a return of their interests to them in the 1937 MWD Stipulation.

6       140. LMMP's Bankruptcy attorney informed LMMP that it could file a Chapter 11 and

7   conclude its Rescission claim in Case No. BC 600724, in an Adversary Proceeding in the Chapter 11

8   proceeding, thus LMMP filed its Chapter 11 proceeding on May 13, 2016.

9       141. During the Chapter 11 proceedings in which LMMP informed the Bankruptcy Court it

10  would file an Adversary Proceeding to rescind the January 2013 agreements PECAS unlawfully and

11  unconsciously induced LMMP to sign, on July 18, 2016, PECAS took the deposition of Holmes.

12  PECAS and Holmes disclosed a declaration PECAS and its attorneys induced Holmes to sign, and in

13  said declaration, PECAS suborned the perjury of Holmes by drafting for Holmes a said declaration

14  PECAS induced Holmes to sign in or about April 29, 2016, inducing Holmes to testify in both the

15  April 29, 2016 declaration and in the July 18, 2016 deposition that he never wanted to rescind the

16  January 2013 PECAS and LLMP agreements. The cross examination of Holmes in the afternoon of

17  July 18, 2016 and in the morning of July 19, 2016, demonstrated multiple instances of perjury

18  suborned by PECAS. The PECAS intent was an effort to hide their prior fraud against Merritt in

19  which they engaged in a complicity with Holmes and others in a theft, embezzlement and

20  misappropriation of the one half (½) interest Holmes had in LMMP, or the 1937 MWD Stipulation

21  that Holmes had given to Merritt, as PECAS had admitted that they, PECAS, would never be able to

22  perfect title in the transfer of LMMP's assets if Holmes actually did give Merritt one half of his

23  interest in LMMP. The subornation of the Holmes perjury is the active and persistent presence of

24  factors that warrant application of the continuing violation doctrine of fraud and conspiracy to

25  defraud Merritt up to and at least continuing until July 18, 2016.

26      142. In September 2017, the Chapter 11 trustee erroneously determined that LMMP had no

27  value and sold the 25% interest LMMP had in PECAS back to PECAS for approximately

28  $75,000.00; if LMMP had no value no person would buy the 25% interest for $75,000.00.

Verified Adversary Complaint by Plaintiffs Paul Merritt against all named Defendants

143. The above facts detail an absolute ethical, moral and legal atrocity precipitated by PECAS to induce Holmes and his agents to steal, convert, embezzle and misappropriate from Merritt, the interest Holmes had previously given to Merritt to enable PECAS the fiction of a lawfully authorized transfer that ultimately led to Merit's interest being unjustly eviscerated.

144. Merritt is informed and believes PECAS sold its interests to Chabad Temple for a tax advantage of many millions, and Merritt alleges that PECAS principals will allow Merritt to proceed to monetize his rights against the MWD pursuant to the 1927 MWD Stipulation but require a payment from Merritt of many millions.

145. Merritt, on behalf of himself, his creditors and investors, seeks a judgment that determines his and their claims to and clouds upon title to real property, and water and mineral rights incident to a Written Stipulation and Settlement Agreement executed by the Metropolitan Water District ("MWD") in 1937, as against all known defendants, and also all other persons unknown claiming any right, title, estate, lien or interest in the real property and water and mineral rights described in the complaint as set forth above that are adverse to Plaintiff's ownership or any cloud upon Plaintiff's title thereto and seeks Declaratory Relief to Quiet Title, and relief for violations of Cal. Bus. & Pro. Cd. ("B&P") § 17200 for an unlawful business practice and an unfair business practice (Unfair Competition) and for an Actual Fraudulent Transfer.

## FIRST CLAIM OR CAUSE OF ACTION

(Declaratory Relief by Plaintiff Merritt against all Defendants, and Each of Them)

146.. Merritt restates and incorporates by reference hereat, the above paragraphs 1 through 145 as if fully set forth hereat.

147. An actual controversy now exists between Merritt and PECAS, and all Defendants, and each of them relating to the legal rights and duties of the respective parties arising out of the relationship between them and the purchase by PECAS of LMMP's assets in January 2013, and sale by LMMP of its assets to PECAS in January 2013 as described above.

148. Merritt contends, incident to the badges of fraud pursuant to Cal. Civ. Cd. § 3439 et. seq. and BC § 548(a)(1), PECAS and no other person or entity ever perfected title in his 18.9989% interest in LMMP (or LMMP's assets, the 1937 MWD Stipulation) and that the gravamen of facts of

Verified Adversary Complaint by Plaintiffs Paul Merritt against all named Defendants

1  which Merritt has complained as set forth above constitute a continuing attempt by PECAS to

2  conceal the fraudulent transfer of his 18.9989% interest in LMMP and the 1937 MWD Stipulation,

3  the theft, conversion, embezzlement and misappropriation of his property, and entitled him to a quiet

4  title judgement in his favor as against, in accordance with Code Civ. Proc., §§ 762.010, PECAS, and

5  as against all Defendants, and each of them and as against all other persons unknown claiming any

6  right, title, estate, lien or interest in the said property described in the complaint as set forth above in

7  that:

8      A. The contract and agreement between PECAS and LMMP in January 2013, was unlawful

9  and unconscionable;

10     B. Merritt has an absolute legal right to intervene and ask for Declaratory Relief pursuant to

11  the theft, embezzlement, conversion, and misappropriation and the Order of the Superior Court of

12  California, County of Riverside in Case No. RIC 130928;

13     C. The agreements between PECAS and  LMMP's in January 2013, were unlawful and

14  unconscionable, and must be rescinded;

15     D.  PECAS, through its principals, entered into an unlawful conspiracy with Holmes and

16  Avery to steal, convert, embezzle and unlawfully misappropriate Merritt's 18.9989 percent interest in

17  LMMP;

18     E. Merritt's 18.9989 percent interest in LMMP equates with an 18,9989 percent interest in the

19  1937 MWD Stipulation;

20     F. That LMMP's 25% interest PECAS that PECAS purchased in September 2017, must be set

21  aside or at least set aside as to Merritt's interest in his 18.9989 % interest in LMMP and the 1937

22  MWD Stipulation;

23     G. That Merritt is entitled to quiet the title to and clouds upon title to all property rights

24  incident to a Written Stipulation and Settlement Agreement executed by the MWD in 1937, the

25  Riverside Superior Court's Order on July 14, 2015 in Case No. RIC 130928 as against all known

26  defendants, and also all other persons unknown claiming any right, title, estate, lien or interest in the

27  real property and water and mineral rights described in this Verified Complaint as set forth above that

28  are adverse to Merritt's ownership or any cloud upon Merritt's title thereto

149. All Defendants, and each of them,  deny Merritt's contentions, deny that Merritt has any right, title or interest as he complains, and maintain that the purchase by PECAS of LMMP's assets in January 2013, and the sale by LMMP of its assets to PECAS was valid, enforceable, and that the interests of Merritt are not severable from the acquisition of LMMP's assets by PECAS in January 2013,  and the interests of Merritt are not severable from the acquisition of LMMP's 25 class D units in PECAS in September 2017 by PECAS, and that the transfer by PECAS to Chabad of the LMMP asset in April 2020 was did not interfere with Merritt's right, title and interest in the LMMP asset or the 1937 MWD Stipulation as described above.

150. An actual controversy now exists between Merritt and Defendants, and each of them, relating to the legal rights and duties of the respective parties arising out of the relationship between them and the purchase and sale of the LMMP assets in January 2013 and in September 2017 and the transfer of said asset to Chabad in or about April 2020.

151. Merritt desires a judicial determination and declaration of the parties respective rights, duties and obligations of Merritt and all Defendants, and each of them, a declaration that Merritt's interest in LMMP are to be provided back to Merritt as Merritt's remedy at law is not adequate and that Defendants provide all Merritt"s attorney fees and costs.

152. Merritt also contends that, as a proximate result, Merritt is entitled to a declaration that he is entitled to a permanent mandatory and prohibitive injunction against all Defendants, and each of them, in a form to be presented to the Court or in a form that the Court will provide, to ensure that he is provided back the entirety of his 18.9989% interest in LMMP or in PECAS, which is the interest in the 1937 MWD Stipulation, pursuant to the Court Order on July 14, 2015 in RIC 130928, and a declaration that he is entitled from the Defendants, and each of them, all his costs and attorney fees under California Civil Code 1021.5.

## SECOND CLAIM OR CAUSE OF ACTION

(Violation of Cal. Bus. & Pro. Cd. § 17200, Et. Seq - Unfair Competition)

(by Plaintiff Merritt against Defendant PECAS)

### (A) Unlawful Business Practice

///

153. Merritt restates and incorporates by reference hereat, the above paragraphs 1 through 152 as if fully set forth hereat.

154. California's Business and Professions Code ("B&P") § 17200, Et. Seq. the Unfair Competition Law, defines unfair competition to include, any unlawful, unfair or fraudulent business act or practice. The unlawful practices supporting a 17200 claim are any practices forbidden by law be it civil or criminal, federal or state, municipal, statutory, regulatory or, court made. In effect Unfair Competition Law borrows violations of other laws and treats them as unlawful practices independently actionable under B&P § 17200.

155. PECAS violated Merritt's rights by engaging in an Unlawful Business practice under California Business & Professions Code § 17200, as they engaged in an **Actual Fraudulent Transfer** in the meaning of Cal. Cv. Cd. § 3439, et seq, in that:

A. Merritt's 18.9989% interest in LMMP and the 1937 MWD agreement are an asset in the meaning of Cal. Civ. Cd. § 3439.01(a)(1) and Bankruptcy Code ("BC") § 548(a)(1) as PECAS made and had an actual intent to defraud Merritt and conceal the underlying unconscionable and unlawfulness of the January 2013 agreements between PECAS and LMMP.

B. Pursuant to the admissions of the PECAS principals that, if Holmes actually did give Merritt one half of his interest in LMMP, PECAS would never have the legitimate, lawful right to perfect the transfer of LMMP into it, PECAS, nor transfer LMMP's assets in the 1937 MWD Stipulation to it, PECAS in the January 2013 agreements between PECAS and LMMP, the transfer of LMMP's assets to PECAS was never lawfully perfected. The alleged transfer of LMMP's assets to PECAS that PECAS alleges occurred in January 2013, would, by operation of law, occur immediately prior to the commencement of Merritt's action herein in the meaning of Cal. Civ. Cd. § 3439.06, removing from. PECAS immunity for the un-perfected transfer.

C. Pursuant to the July 7, 2015 Riverside Superior Court Order in RIC 130928, Merritt is a creditor of LMMP, and in accordance with Cal. Civ. Cd. §§ 3439.01(c)(g), and Cal. Civ. Cd. § 3439.04(a), and Cal. Civ. Cd. § 3439.07, Merritt is a creditor against PECAS and has a claim against PECAS and all those in complicity with PECAS in the meaning of Civ. Cd. § 3439.01(b).

///

D. LMMP is the debtor and PECAS is a joint debtor by virtue of the conspiracy PECAS through its principals entered into with LMMP in January 2013, and bu virtue of the purchase of PECAS of LMMP's 25% interest in PECAS in September 2017,

E. The agreement in which PECAS induced LMMP to sell LMMP's right, title and interest in the 1937 MWD Stipulation was a transfer in the meaning of Cal. Civ. Cd. § 3439.01(I), and the obligations to LMMP and its limited partners pursuant to Cal. Civ. Cd. § 3439.04.

F. In accordance with the facts as noted above and the wrongful actions between PECAS and its principals, (a) they induced LMMP to transfer its right, title and interest to PECAS in a manner that was unconscionable, unjust and warrants cancellation in accordance with Cal. Civ. Cd. § 3412; and, (b) was a fraud upon LMMP and its limited partners, including the Merritt, the creditor herein in the meaning of Cal. Civ. Cd. § 3439.04(a).

G. In this regard, in accordance with the January 2013 agreements between PECAS and LMMP, there was an actual fraudulent transfer of Merritt's interest as ordered in Case No. RIC 130928 in the meaning of Cal. Civ. Cd. § 3439.04(a), and the transfer by LMMP to PECAS in January 2013 can be avoided as there was an actual intent by PECAS to hinder, delay and defraud Merritt in the meaning of Cal. Civ. Cd.§ 3439.04(a) and *Acequia v. Clinton (In re: Acequia, Inc.)* (9th Cir. 1994) 34 F.3d 800, 806 and BC § 548(a)(1).

H. PECAS engaged in a practice pattern of fraud from the circumstances surrounding the transfer as noted above. PECAS had knowledge of and acted in complicity with the theft, embezzlement and misappropriation of Merritt's interest in LMMP, and the 1937 MWD Stipulation. PECAS had knowledge that the required legal formalities of perfecting title were not observed or were obtained by fraud and fiction during the January 2013 transfer.  PECAS had knowledge that Holmes and LMMP was threatened with suit by Merritt for a return of his 18.9989% interest misappropriated from him while the transfer was occurring. PECAS  demonstrated a practice of concealing and removing assets such as Merritt's interest that are in the aggregate badges of fraud in the meaning of *In re: Agricultural Research and Tech Group, Inc.* (9th Cir. 1990) 916 F.2d 528, 538

///

///.

Verified Adversary Complaint by Plaintiffs Paul Merritt against all named Defendants

1    I. Merritt has suffered injury in fact and has lost money or property as a result of such unfair

2    competition and the aggregate of facts regarding the persistent and continuing fraud, deception and

3    concealment by all Defendants, and each of them.

4    J. Pursuant to the relationship between the PECAS principal., Reid Breitman and Chabad, the

5    transfer of the PECAS interest to Chabad in or about April 2020, that was the LMMP interest in the

6    1937 MWD Stipulation, was not in good faith as Chabad knew or reasonably should have known

7    Merritt's accusation that PECAS and its principals engaged in fraud when PECAS induced LMMP to

8    transfer its assets in the 1037 MWD Stipulation to PECAS in  January 2013 in the meaning of Cal.

9    Civ. Cd. §§ 3439.08(b).

10    K. As a proximate result, the transfer of LMMP's assets to PECAS in January 2013 is

11    required to be avoided in its entirety, and cancelled in the meaning of Cal. Civ. Code § 3412 to

12    satisfy the claims of the creditor, Merritt in the meaning of Cal. Civ. Cd. § 3439.07(a), and BC

13    548(a)(1) and *In re: Acequia*, supra, 34 F.3d @ 809.

14    L. As a further proximate result, Merritt, the creditor, is entitled to judgment against PECAS

15    for the transfer from LMMP in the meaning of Cal. Civ. Cd. §§ 3439.08(b), and is entitled to a

16    mandatory injunction in a form to be presented to the Court or in the form that the court will provide

17    that requires PECAS to return to Merritt, his 18.9989% percent interest in LMMP or PECAS or the

18    equivalent of the 1937 MWD Stipulation, or prohibiting PECAS from monetizing the assets

19    transferred to them without restitution to Merritt in an amount equal to 18.9989% of the asset LMM

20    transferred to PECAS or the equivalent value in the 1937 MWD Stipulation.

21    M. PECAS had knowledge of Merritt's continuing efforts for a restitution of his 18.9989%

22    interest in the LMMP asset unlawfully transferred to PECAS, the interests in the 1937 MWD

23    Stipulation.  In an effort to immunize itself, PECAS,  from being required to provide restitution to

24    Merritt, in December 2019, PECAS transferred to Chabad, the LMMP asset for some alleged

25    unknown tax advantage. PECAS caused Chabad to transfer back the asset to PECAS and

26    subsequently transferred back to Chabad the LMMP asset in April 2020 for the alleged unknown tax

27    advantage. Reid Breitman, one of the principals of PECAS intimated, implied and inferred to Merritt

28    ///

1    that he and PECAS had some unknown equitable control of Chabad's decision making with respect

2    to the LMMP asset transferred to PECAS, now transferred to Chabad.

3        N. As a further proximate result of the continuing concealment by PECAS of its fraudulent

4    activity as described above, Merritt is entitled to an Order and Judgment against Chabad to prevent

5    the use or employment by PECAS and Chabad of any fraudulent practices that precipitate the

6    continuing unlawful fraud and unfair competition against Merritt necessary to restore to Merritt his

7    18.9989% interest in the money and property Merritt lost as a result of the fraud and unfair

8    competition as alleged above as Chabad, under the aggregate of facts as described above, can be held

9    liable for said Cal. Bus. & Pro Cd. § 17200 or § 17500 violation in the meaning of Cal. Bus. & Pro

10   Cd. §§ 17203, 17535.

11       O. As a further proximate result, Merritt, as the creditor is entitled to an injunction against

12   any further transfer or disposition of the LMMP asset transferred to PECAS or Chabad in the

13   meaning of Cal. Civ. Cd. §§ 3439.07(a)(3)(A).

14       P. As a further proximate result thereof, Merritt, the creditor, is also entitled to any other

15   relief the circumstances of the fraud committed against him as may be required to remedy the loss of

16   his 18,9989% interest in the 1927 MWD Stipulation and LMMP in the meaning of Cal. Civ. Cd. §§

17   3439.07(a)(3)(C) in addition to costs of suit and attorney fees.

18                 **THIRD CLAIM OR CAUSE OF ACTION**

19             (Actual Fraudulent Transfer Violation of Civil Code 3439 et. seq.)

20                (by Plaintiff Merritt against Defendant PECAS)

21       156. Merritt restates and incorporates by reference hereat, the above paragraphs 1 through

22   155 as if fully set forth hereat.

23       157. Merritt was and is a creditor of both LMMP and PECAS, and both PECAS and LMMP

24   engaged in a conspiracy to convert, steal, embezzle and unlawfully misappropriate Merritt's

25   18.9989% interest in LMMP and the 1037 MWD Stipulation and PECAS fraudulently and

26   unlawfully induce LMMP to actually transfer such interest to PECAS and such transfer of Merritt's

27   interest was done with the intent to hinder, delay and defraud Merritt of his 18.9989% interest.

28   ///

158. As a proximate result, the transfer of LMMP's assets to PECAS in January 2013 is required to be avoided in its entirety to satisfy's the claims of the creditor, Merritt in the meaning of Cal, Civ. Cd. § 3439.07(a) and BC 548(a)(1).

159. As a further proximate result, Merritt, the creditor, is entitled to judgment against PECAS for transfer from LMMP in the meaning of Cal. Civ. Cd. §§ 3439.08(b), and in the amount of (a) the value of LMMP's assets transferred to PECAS in January 2013, or, in the alternative, the amount necessary to satisfy Merritt's claim in the meaning of Cal. Civ. Cd. §§ 3439.08(b)(c).

160. As a further proximate result thereof, Merritt, the creditor, is also entitled to an injunction against any further transfer or disposition of the LMMP asset transferred to PECAS in the meaning of Cal. Civ. Cd. §§ 3439.07(a)(3)(A).

161. As a further proximate result thereof, Merritt, the creditor, is also entitled to any other relief for the circumstances of the fraud committed against him as may be required to remedy the loss of his 18,9989% interest LMMP abd in the 1937 MWD Stipulation in the meaning of Cal. Civ. Cd. §§ 3439.07(a)(3)(C) in addition to costs of suit and attorney fees.

162. As a further proximate result thereof, the actions of PECAS were intentional, deceit, concealing material facts as PECAS specifically intended to deprive Merritt of his property, money, legal rights and caused Merritt injury and, the conduct of PECAS was despicable, subjecting Merritt to humiliation, mental distress, with a conscious disregard of Merritt's rights so as to justify an award of exemplary and punitive damages.

**WHEREFORE**, Merritt, prays for relief as follows:

**On the First Claim or Causes of Action**:

1. For a Declaration that:

A. Merritt has an absolute legal right to intervene and ask for Declaratory Relief pursuant to the theft, embezzlement, conversion, and misappropriation of his 18.9989% interest in LMMNP unlawfully transferred to PECAS and pursuant to the Order of the Superior Court of California, County of Riverside in Case No. RIC 130928;

B. The agreements between PECAS and LMMP's in January 2013, were unlawful and unconscionable, and must be cancelled;

1      C. PECAS, through its principals, entered into an unlawful conspiracy with Holmes and

2  LMMP to steal, convert, embezzle and unlawfully misappropriate Merritt's 18.9989 percent interest

3  in LMMP;

4      D. Merritt's 18.9989 percent interest in LMMP equates with an 18,9989 percent interest in

5  the 1937 MWD Stipulation;

6      E. LMMP's 25% interest that PECAS purchased in September 2017 must be set aside or set

7  aside as to Merritt's 18.9989 % interest in LMMP and the 1937 MWD Stipulation;

8      F. Merritt is entitled to quiet the title to and clouds upon title to real property, and water and

9  mineral rights incident to a Written Stipulation and Settlement Agreement executed by the MWD in

10  1937, the Riverside Superior Court's Order on July 7, 2015 in Case No. RIC 130928 as against all

11  known defendants, and also all other persons unknown claiming any right, title, estate, lien or interest

12  in the real property and water and mineral rights described in this Verified Adversary Proceeding as

13  set forth above that are adverse to Merritt's ownership or any cloud upon Merritt's title thereto.

14      3. For such other and further relief as the Court may deem just and proper.

15  **On the Second Claim or Cause of Action**

16      1. For an Injunction in a form to be presented to the Court or that the Court will provide;

17      2. For restitution in the amount of Merritt's 18.9989% interest in the LMMP asset transferred

18  to PECAS or the equivalent value of 18.9989% interest in the 1937 MWD Stipulation;

19      3. For costs of suit and attorney fees;

20      4. For such other and further relief as the Court may deem just and proper.

21  **On the Third Claim or Cause of Action**

22      1. For compensatory damages in the amount according to proof;

23      2. For punitive damages in an amount according to proof;

24      3. For costs of suit and attorney fees;

25      4. For such other and further relief as the Court may deem just and proper.

26  Dated: July 16 , 2020

                                   Paul Merritt / Plaintiff

27                                   In Pro Per

28  ///

Verified Adversary Complaint by Plaintiffs Paul Merritt against all named Defendants

## **VERIFICATION**

I, Paul Merritt, declare that I have read the foregoing Verified Adversary Proceeding Complaint, and know the contents therein.

I am a Plaintiff in this action and I make this verification for that reason.

I have read the foregoing document described as a Verified Adversary Proceeding Complaint for Declaratory Relief to Quiet Title and for Violators of California's Business and Professions Code § 17200, for an Unlawful Business Practice, and for Actual Fraudulent Transfer and know its contents thereof.

The matters stated in it are true of my own knowledge, except as to those matters which are stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury, under the laws of the State of California, and under the laws of the United states of America, that the foregoing is true and correct.

Dated: July 16, 2020

Paul Merritt

///

///

///

///

///

///

///

///

///

///

///

///

///

///

Verified Adversary Complaint by Plaintiffs Paul Merritt against all named Defendants

1

**PROOF OF SERVICE**

2

3      I, JIM LANE, hereby declare that I am over the age of eighteen years and am not a party to

4  the within above-entitled action, that I am employed in the County of Los Angeles, State of

5  California, and that my business address is 4265 Marina City Drive, Suite 407W, Marina del Rey,

6  CA 90292.

7      On  July 17, 2020, I served a true and correct copy of the following document or pleading

8  on the interested parties or their counsel of record:

9

10 VERIFIED ADVERSARY COMPLAINT FOR: 1. DECLARATORY RELIEF TO QUIET

11 TITLE 2. VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE §

12 17200 FOR AN UNLAWFUL BUSINESS PRACTICE 3. ACTUAL FRAUDULENT

13 TRANSFER

14

15      [X]  [BY U.S. MAIL] On this same day,  I mailed the interested parties or their counsel of

16 record the above-described document or pleading by regular United States mail to their respective

17 service or mailing addresses.

18                    SEE ATTACHED SERVICE LIST

19

20      I declare under penalty of perjury under the laws of the United States of America that the

21 foregoing is true and correct, and that this Declaration was executed on July 17, 2020, at Los

22 Angeles, California.

23

24 

25

26                    JIM LANE

27                    Declarant

28

1

2                                    SERVICE LIST

3

4        JULIET Y. OH, ESQ.

5        LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.

6        10250 CONSTELLATION BOULEVARD, SUITE 1700

7        LOS ANGELES, CA 90067

8        Email: EMW@LNBYB.COM; JYO@LNBYB.COM

9

10       ELISSA D. MILLER, ESQ.

11       SULMEYER KUPETZ

12       333 S. HOPE ST., 35TH FL.

13       LOS ANGELES, CA 90071

14       Email: emiller@sulmeyerlaw.com

15

16       Michael J. Berger, Esq,

17       9454 Wilshire Blvd., 6th Floor

18       Beverly Hills, CA 90212

19

20

21

22

23

24

25

26

27

28